UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

| | |
|---|---|
| BRUHN NEWTECH A/S </br> Gladsaxevej 402 </br> DK-2860, Soeborg, Denmark </br></br> and </br></br> BRUHN NEWTECH, INC. </br> 14438 Whitemoss Terrace </br> Lakewood Ranch, FL 34202, </br></br>   Plaintiffs, </br></br> v. </br></br> THE JOHNS HOPKINS UNIVERSITY </br> APPLIED PHYSICS LABORATORY, LLC </br> 11100 Johns Hopkins Road </br> Laurel, Maryland 20723 </br> Howard County </br></br>   Serve on: </br>   Jacqueline E. Wells </br>   11100 Johns Hopkins Road </br>   Laurel, Maryland 20723 </br>   Registered Agent, </br></br>   Defendant. | ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) Case No. </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) </br> ) |

## COMPLAINT

COME NOW the Plaintiffs, Bruhn NewTech A/S and Bruhn NewTech, Inc., by and through their attorneys Davis, Agnor, Rapaport & Skalny, LLC, and allege as follows:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Bruhn NewTech A/S ("BNT-Denmark") is a Danish corporation which maintains its principal place of business in Denmark at the address set forth in the case caption. BNT-Denmark is in the business of creating, marketing and selling computer software.

2.      Plaintiff Bruhn NewTech, Inc. ("BNT-US") is a Delaware corporation which maintains its principal place of business in Florida at the address set forth in the case caption. BNT-US is a wholly owned subsidiary of BNT-Denmark, and is in the business of marketing and selling computer software.

3.      Defendant The Johns Hopkins University Applied Physics Laboratory, LLC ("JHU APL" or "Defendant") is a Maryland limited liability company which maintains its principal place of business in Maryland at the address set forth in the case caption. Defendant is in the business of providing services to the United States Government and other government entities.

4.      The amount in controversy exceeds $75,000.

5.      Count I sets forth an action that arises under the copyright laws of the United States, presents questions of federal law, and is a dispute between parties of diverse citizenship. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, and 1338.

6. Count II sets forth an action that arises under the laws of the State of Maryland, and is a dispute between parties of diverse citizenship. This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367.

7. Venue is proper pursuant to 28 U.S.C. §§ 1391(b), as Defendant is subject to this court's personal jurisdiction and resides in this District.

## FACTS COMMON TO ALL COUNTS

8. Plaintiffs develop, market, and sell software utilized in military systems that track and analyze chemical, biological, radiological and nuclear agents ("CBRN") in battlefield or civilian environments. The software relevant to this action was originally known as "NBC-ANALYSIS" software, and was later re-designated as "CBRN-ANALYSIS" software (collectively, the "Software"). The Software is used by civilian and military organizations to integrate CBRN data, sensor alert information, and observation reports from battlefield or civilian environments, and then generates plots of the hazard area and warning messages to military units or civilian authorities to warn of CBRN hazards.

9. BNT-Denmark is the proprietor of registered copyrights in the United States on the computer code within the Software (U.S. Copyright Reg. Nos. TX0007836490 and TX0007836500).

10. The Software is the primary product of BNT-Denmark. In a typical year, greater than 90% of BNT-Denmark's annual revenue is derived directly from licensing of the Software. For many years, BNT-Denmark has authorized BNT-US to market and sell the Software to countries

and government organizations outside of Europe.  During the same period, BNT-Denmark has marketed and sold the Software to countries and organizations in Europe.

11. The Software is offered for licensure by Plaintiffs in two formats: "dongled" and "undongled."  Dongled versions of the Software are protected by a hardware dongle, which prevents the dongled Software from being replicated, copied or further distributed beyond the computer(s) on which it is initially loaded.  Dongled versions of the Software have been sold by BNT-Denmark for use in 23 NATO nations, and dongled versions of the Software have also been sold by Plaintiffs for use in at least eight non-NATO nations.

12. Alternatively, when Plaintiffs negotiate a license of the Software to a nation for use throughout the nation's armed forces and government, Plaintiffs undertake such a sale in conjunction with a national license, pursuant to which the Software may be freely used throughout the nation's armed forces and government, but only in a manner consistent with the terms of the negotiated national license.  For sales under a national license, an "undongled" version of the Software is delivered to the purchasing nation.  Undongled versions of the Software have the physical capacity to be replicated and copied, but the terms of the license under which the Software is delivered prohibit replication or distribution of the Software other that in strict compliance with the license.

13. Plaintiffs rely on adherence to the terms of the national license to prevent unauthorized replication, copying or further distribution of the Software in these circumstances.  The license terms for undongled versions of the Software include contractual guarantees that the licensee government shall not permit the Software to be distributed beyond the nation's armed

forces (or other governmental organizations described in the license).  It is vital to Plaintiffs' business that the Software be protected from unauthorized copying or distribution, since unauthorized copying or distribution will substantially harm or destroy the market for future licensure of the Software to other nations or armed forces.

14. Among the nations that have purchased national licenses (and therefore have received undongled versions of the software) are the United States, Great Britain, Canada, Denmark, Sweden, Norway and the Netherlands.

15. On or about May 13, 1998, the U.S. Department of Defense ("DOD") and the United States Marine Corps ("USMC") awarded to BNT-US a United States Government contract, Contract No. M67854-98-C-2076 (the "Contract"), whereby the United States Government purchased the Software and certain training and materials.  A copy of the Contract is attached hereto as Exhibit A.

16. Incorporated within the Contract is a Commercial Computer Software License Agreement (the "Software License"), pursuant to which BNI-US granted a national license of the Software to the United States Government.  A copy of the Software License is attached hereto as Exhibit B.

17. Pursuant to the terms of the Software License, BNI-US provided the Software to the United States Government in "undongled" form, to thereafter be freely copied and distributed among United States Government agencies and armed forces, pursuant to the national license granted to the United States Government.  The Software License made clear that neither the United States Government, nor any of its employees or contractors, was permitted to "give, sell, license or

otherwise provide copies of the software or use of the software to any third party person or entity including…governments of foreign countries…"

18. After BNI-US entered into the Contract, DOD established a Joint Program Executive Office to centralize within the United States armed forces all research, development, acquisition, fielding and life-cycle support of chemical and biological defense equipment and medical countermeasures. Within this Joint Program Executive Office, several Joint Project Managers lead, manage and direct the acquisition and fielding of chemical and biological detection and reconnaissance systems, individual and collective protection systems, decontamination systems, information management systems, medical devices, drugs and vaccines, installation and force protection systems, and other systems.

19. Following establishment of the Joint Program Executive Office, management of the Contract within the U.S. Government was transferred, in or about 1998, from the USMC to one of the eight Joint Project Mangers: the Joint Program Manager – Information Systems ("JPMIS"), within DOD. Upon information and belief, the Joint Warning and Reporting Network ("JWARN") program that deploys the Software within the U.S. military has been managed by JPMIS since that time. JPMIS is staffed by a combination of uniformed military and civilian government employees, along with many outside Systems Engineering and Technical Assistance (SETA) contractors.

20. In the context of the Korean theater of United States military operations, the CBRN program is known as "JWARN Block 1F Signal Fire." One of the SETA contractors working for the DOD to support JWARN Block 1F Signal Fire in South Korea has been JHU APL.

21. The Software License recites that "the rights of the [U.S.] Government regarding [the Software's] use, reproduction and disclosure are as set forth in Government Contract No. M67854-98-C-2076." The Contract provides:

> All software to be delivered under this contract including source codes, is commercial computer software subject to restricted rights specified in FAR 52.227-19 "Commercial Computer Software—Restricted Rights" with the following additions to that clause:
>
> 1. The Government may make an unlimited number of copies of the software and may distribute and use the software in any computers owned or leased by the Government and operated by the U.S. Government personnel working for U.S. Government departments, organizations and agencies;
>
> 2. The Government's use of the software shall be limited to use in fulfillment of functions of the Government of the United States;
>
> 3. The Government shall not disclose the software and shall not give, sell, license or otherwise provide copies of the software or use of the software to any third party person or entity including but not limited to members of the public, governments of foreign countries, or international agencies or organizations.

22. In or before March 2013, while serving as a contractor to the United States Government, JHU APL transferred copies of the undongled Software to the armed forces of the Republic of Korea ("ROK" or "South Korea"), in breach of the Software License. This un-dongled form had no hardware technical controls that would prevent it from thereafter being widely copied and distributed across ROK agencies or armed forces.

23. At no time have Plaintiffs authorized JHU APL, or the United States Government, to distribute the Software to the ROK government, agencies, or armed forces.

24. Plaintiffs first learned of this breach of the Software License in March 2013, when a contractor working for JHU APL informed BNI-US that he loaded the Software onto several

7

computer hard drives designated for delivery to ROK armed forces, for installation on laptop computers that would be operated by South Korean forces without oversight or monitoring by DOD.

25. JHU APL was made aware of the above unauthorized distribution of the Software to ROK armed forces, at the time it occurred. A supervisory employee of JHU APL was advised, at that time, of the terms of the Software License, and of the fact that provision of the Software to ROK forces would violate the terms of the Software License. JHU APL nonetheless thereafter caused computer hard drives containing the Software to be installed on laptop computers of ROK armed forces, and allowed those computers to be removed by ROK forces without monitoring or escort.

26. Upon learning of the breach of the Software License, BNI-US promptly contacted the Deputy Assistant Program Manager (DAPM) for the JWARN Block 1 Program, and informed him that JHU APL violated the terms of the Software License by transferring the Software to ROK armed forces. Attached hereto as Exhibit C is an email exchange between Michael S. Meyer, the DAPM for Signal Fire Block 1, and a representative of BNI-US. In this correspondence, the JHU APL representative admits that (as of March 12, 2013) at least five to ten laptop computers containing the Software had already been provided by JHU APL to ROK forces, "where they can use/operate the laptops without [United States Government] intervention or supervision." The JHU APL representative further stated that he was aware of no physical protections utilized on the subject laptops to prevent the hard disks from being removed and cloned. "The entire laptop [was provided to ROK forces], pre-built with all software pre-installed and configured. Basically a turn-

key system." The JHU APL representative thereafter confirmed that ROK forces were given seven laptops containing the Software.

## COUNT I
## VIOLATION OF UNITED STATES COPYRIGHT ACT

27.     Plaintiff adopts and realleges the allegations set forth in Paragraphs 1 through 26.

28.     JHU APL's transfer of the Software to ROK armed forces was undertaken without the permission of the owner of the copyrights of the material in the Software's code, instruction manuals, screen display, maps, visuals, artwork, or other original work of authorship fixed in the Software.  This violation of the Copyright Act was undertaken in contradiction of Plaintiffs' exclusive right to determine whether and when to copy these works, and Plaintiffs' exclusive right to determine whether and when to distribute these works.

29.     JHU APL's unauthorized transfer to ROK armed forces resulted in loss of revenue to Plaintiffs from licensing fees, loss of control of the copying and distribution of the Software, and inability to stop further damages from occurring due to further copying and distribution of the Software.

30.     By reason of JHU APL's infringement, through its unauthorized copying and distribution of the Software to ROK armed forces, Plaintiffs have sustained and will continue to sustain injury, loss and damage to its ownership rights in the Software, and are entitled to recover from JHU APL the damages sustained by Plaintiffs as a result of JHU APL's acts.  Plaintiffs are at present unable to ascertain the full extent of the monetary damage it has suffered by reason of JHU APL's acts of copyright infringement, but Plaintiffs are informed and believe, and on the basis of such information and belief allege, that Plaintiffs have sustained such damage in the amount

exceeding Forty Two Million Dollars ($42,000,000).  This amount is the estimated revenue that Plaintiffs would have received from the ROK for licensure of the Software, over the expected life of the license, had the ROK licensed the Software instead of receiving it from JHU APL in violation of the U.S. Government's license.

31.     Plaintiffs are further entitled to recover from JHU APL the gains, profits, and advantages it has obtained as a result of its acts of copyright infringement.  Plaintiffs are at present unable to ascertain the full extent of the gains, profits, and advantages JHU APL has obtained by reason of its acts of copyright infringement, but Plaintiffs are informed and believe, and on the basis of such information and belief allege, that Defendant has obtained such gains, profits, and advantages in an amount exceeding Forty Two Million Dollars ($42,000,000).

WHEREFORE, Plaintiffs pray for entry of judgment in favor of both Plaintiffs, and against Defendant:

A.     In an amount in excess of Forty Two Million Dollars ($42,000,000) to be determined at trial, plus interest; and in addition

B.     In the amount of Plaintiffs' reasonable attorneys' fees and costs incurred in this action; and in addition

C.     For such other and further relief as the Court deems just and proper.

COUNT II
VIOLATION OF THE MARYLAND UNIFORM TRADE SECRETS ACT

32. Plaintiff adopts and realleges the allegations set forth in Paragraphs 1 through 31.

33. The Software is a computer program that derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.  If the Software were permitted to be distributed beyond licensees to third parties, through unauthorized copying, the market for licensing the Software to nations or armed forces that are not already licensees of the Software would be substantially harmed or destroyed.

34. Plaintiffs have taken reasonable steps to protect the secrecy of the code that is included within the Software.  Plaintiffs have distributed the software only in secure dongled form, or in un-dongled form secured by written national licenses limiting its use and further distribution. Plaintiffs have marked all distributed copies of the Software as being subject to copyright. When the Software is installed on hardware, a JWARN installer screen informs the user of the terms of license under which the Software may be used or distributed.  A screen shot of this pop-up window, and the text that is set forth in that window for Software that is installed on U.S. Government computers, are reflected in Exhibit D.  Following installation of the Software, the license terms remain visible to users, through the "About" screen of the software interface.  A screen shot of this post-installation display of the license terms is set forth in Exhibit E.  The copyrighted nature of the Software is further communicated within sales contracts with licensees of the Software.

35. As such, the Software is composed of computer code that is a protectable trade secret of Plaintiffs.

36. By distributing the Software to third parties without the permission of Plaintiffs, JPH APL thereby improperly disclosed the trade secrets of Plaintiffs without the consent of Plaintiffs.

37. At the time of this disclosure, JPH APL knew or had reason to know that its knowledge and possession of these trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy and to limit use of these trade secrets.

38. At the time of this disclosure, JPH APL knew or had reason to know that its knowledge and possession of these trade secrets was derived from or through the U.S. Government, and that the U.S. Government owed a duty to maintain the secrecy or to limit use of these trade secrets.

39. JPH APL's unauthorized distribution of Plaintiffs' trade secrets to third parties without permission from Plaintiffs was undertaken willfully and maliciously.

40. JHU APL conducts a substantial portion of its business from its principal offices in Maryland, and loss of the secrecy of Plaintiffs' Software and computer code, arising from JHU APL's tortious act of improperly distributing Plaintiffs' trade secrets, took place within Maryland

WHEREFORE, Plaintiffs pray for entry of judgment in favor of both Plaintiffs, and against Defendant:

A. In the amount of the actual loss to Plaintiffs caused by JPH APL's disclosure of Plaintiffs' trade secrets, which is in excess of Forty Two Million Dollars ($42,000,000), with the amount to be determined at trial, plus interest; and in the alternative

B. In the amount of the unjust enrichment to JPH APL resulting from its disclosure of Plaintiffs' trade secrets, plus interest; and in the alterative

C. In the amount of a reasonable royalty for JPH APL's unauthorized disclosure of Plaintiffs' trade secrets; and in addition

D. For exemplary damages in an amount equal to twice the amount that is awarded by the court for direct damages; and in addition

E. In the amount of Plaintiffs' reasonable attorneys' fees and costs incurred in this action; and in addition

F. For such other and further relief as the Court deems just and proper.

                Respectfully submitted,

                DAVIS, AGNOR, RAPAPORT & SKALNY, LLC

                /s/
By: _____
      Steven J. Lewicky, Esq.
      Bar No. 07464
      slewicky@darslaw.com
      10211 Wincopin Circle, Suite 600
      Columbia, Maryland 21044
      (410) 995-5800 (Telephone)
      (410) 309-6161 (Facsimile)
      Attorney for Plaintiffs